IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DIPAKKUMAR S. PATEL,** | **CRIMINAL ACTION NO.** |
| **BOP Reg. # 52328-424,** | **1:17-CR-277-ELR-JCF-1** |
| **Movant,** | |
| | **CIVIL ACTION NO.** |
| **v.** | **1:18-CV-2952-ELR-JCF** |
| **UNITED STATES,** | **MOTION TO VACATE** |
| **Respondent.** | **28 U.S.C. § 2255** |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Movant, Dipakkumar S. Patel, has filed a 28 U.S.C. § 2255 motion to vacate

his sentence. (Doc. 20). **IT IS RECOMMENDED** that the motion be **DENIED**.

## I.    Background

In 2013, law enforcement began to investigate a massive telephone impersonation scheme in which U.S. citizens and foreign nationals living throughout the United States were being scammed. Typically, victims reported being contacted by persons claiming to be government officials . . . . The victims were told that they had an outstanding order of deportation or tax debt and [were] threatened with immediate arrest and/or deportation from the United States unless they agreed to pay the scammers large sums of money. . . .

A network of runners in the U.S. – many of whom operated in regional crews – were paid to purchase [prepaid debit] cards and transmit their unique card numbers to India-based conspirators who registered the cards and loaded them with victim funds. The U.S. runners then liquidated scam funds from the [debit] cards through the purchase of money orders and deposited those funds into various bank accounts.

(Doc. 29 (Gov't Resp.) at 1-3). On May 3, 2017, Movant was indicted in 1:17-cr-158 for passport fraud; on August 17, the government filed a criminal information in 1:17-cr-277, charging Movant with participating as a runner in a conspiracy to launder the funds obtained as described above (*see* Doc. 1); on that same day, Movant pleaded guilty in both cases; and on February 14, 2018, he was sentenced jointly in the two cases to 51 months' imprisonment. (Gov't Resp. at 3, 6).

> [After] plea discussions, [which began on or about June 21, 2017, Movant] agreed to waive indictment in the fraud and money laundering conspiracy case and plead guilty pursuant to a criminal information that charged one count of general conspiracy in violation of 18 U.S.C. § 371, in case number 1:17-cr-277-ELR; and to the indictment's sole charge of passport fraud in violation of 18 U.S.C. § 1543, in case number 1:17-cr-158-ELR. By resolving his liability to the money laundering conspiracy in the Northern District of Georgia through a pre-indictment plea, he escaped indictment in the related case brought in the Southern District of Texas.

(*Id.* at 3-4 (citing Doc. 3-1 (Guilty Plea and Plea Agreement))).

> [Movant] reached several additional agreements with the government in his written plea agreement. First, the parties agreed that the applicable guideline under the United States Sentencing Guidelines (U.S.S.G.) for calculating [Movant's] advisory guidelines range for the conspiracy charge was § 2S1.1; and that the proper loss/value of laundered funds amount attributable to [Movant] was between $1.5 and $3.5 million, resulting in a 16-level increase of [Movant's] offense level [under § 2B1.1(b)(1)(I)]. (Doc. 3-1 ¶ 12.) Second, the government agreed to recommend a three-level downward adjustment for acceptance of responsibility under § 3E1.1. (*Id.* ¶ 13.) Third, the government agreed to recommend that [Movant] be sentenced at the low end of his adjusted guideline range. (*Id.* ¶ 19.) Fourth, the parties

agreed to recommend that [Movant] receive an additional one-level downward variance at sentencing predicated on his expeditious guilty plea. (*Id.* ¶ 20.) Finally, the plea agreement [stated] that if [Movant's] cooperation was determined by the government to qualify as substantial assistance, the government would file a motion for downward departure [under] U.S.S.G. § 5K1.1, or [under] Federal Rule of Criminal Procedure 35(b) if after sentencing. (*Id.* ¶ 18.)

(*Id.* at 4-5; *see* Plea Agreement ¶ 18 ("[T]he Defendant understands that the determination as to whether Defendant has provided 'substantial assistance' rests solely with the Government. Good faith efforts by the Defendant that do not substantially assist in the investigation or prosecution of another person who has committed a crime will not result in either a motion for downward departure or a Rule 35 motion.")). In sentencing Movant to concurrent 51-month terms of imprisonment, "the Court granted the requested one-level downward variance for [Movant's] expeditious guilty plea and imposed a sentence at the low-end of the advisory guidelines range." (Gov't Resp. at 6).

Movant's plea agreement also includes a Limited Waiver of his right to file an appeal or a § 2255 motion, except that—other than in circumstances that do not apply here—he may raise claims of ineffective assistance of counsel in a § 2255 motion, as he has now done. (*Id.* at 5; *see* Plea Agreement ¶ 31). Movant raises 13 such claims, set forth in detail below. (*See* Doc. 20-1 (Movant's Mem. of Law) at 8-10).

3

## II.   <u>Standard of Review</u>

A federal prisoner may file a motion to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). But it is well-settled that "to obtain collateral relief, a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982).

## III.   <u>Movant's Grounds For Relief: Ineffective Assistance Of Counsel</u>

The Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984); *see Dell v. United States*, 710 F.3d 1267, 1272 (11th Cir. 2013) (applying *Strickland* standard of review to ineffective-assistance-of-counsel claim raised in § 2255 motion). "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Strickland*, 466 U.S. at 697. The analysis involves two components, but a court need not address both if the petitioner "makes an insufficient showing on one." *Id.*

First, a federal court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of

4

professionally competent assistance." *Id.* at 690. The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Internal quotations omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*). Second, a federal court determines whether counsel's challenged acts or omissions prejudiced the petitioner, i.e., whether "there is a reasonable probability" — one "sufficient to undermine confidence in the outcome" — that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

> To prevail on a claim of ineffective assistance, a defendant must establish two things: (1) "counsel's performance was deficient," meaning it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." *Strickland*[], 466 U.S. [at] 687-88 []. To satisfy the deficient-performance prong, the defendant must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687. The defendant must rebut the strong presumption that his counsel's conduct fell within the range of reasonable professional assistance. *Id.* at 689.

5

*Connolly v. United States*, 568 Fed. Appx. 770, 770-71 (11th Cir. 2014).

The undersigned has concluded, after carefully examining Movant's claims and the government's responses, that none of his claims has merit. Below, a general summary follows the presentation of all of Movant's claims. More detailed discussions of particular claims are included as needed.[1]  And where Movant's reply brief adds something of substance to his initial Memorandum of Law, the arguments in his reply brief are addressed as well.

### A.   Counsel Failed To Argue That Movant Had Affirmatively Withdrawn From The Money Laundering Conspiracy.

Movant asserts that he "affirmatively withdrew" from the money laundering conspiracy in June 2015. (Doc. 20-1 at 7). He contends that had counsel argued withdrawal to this Court, "there was a very reasonable probability that the charges for Conspiracy to Commit Money Laundering could have been dismissed on this ground alone." (*Id.* at 8).

The government responds that Movant's assertion, which it does not dispute, is immaterial because he was charged and sentenced based on his participation in the money laundering conspiracy "from in or around September 2014 through

---

[1]  All document references herein are to the 1:17-cr-177 docket unless prefaced with -158, which is used for those documents that are docketed in 1:17-cr-158.

around June 2015." (Gov't Resp. at 11 (quoting -158, Doc. 37 (Plea Hr'g Tr.) at 31)). "All of the actions that [Movant] took, and which were described on the record at the plea hearing as the factual basis to his conspiracy plea, occurred [when he] was laundering funds . . . from about September 2014 to June 2015." (*Id.*). And Movant acknowledges that he understood by January 2015 that his activities constituted fraud and were illegal, but he continued to engage in those activities until June 2015. (Doc. 20-2 (Movant Aff.) ¶ 12 ("[A]fter a couple of months [of laundering funds], I read on the internet [] about Pre-paid Debit Card Frauds in the United Sates. Therefore, around January of 2015, I told my friend that I did not want to do this work anymore. . . . [W]e both decided to quit.")). Moreover, counsel informed the Court at the sentencing hearing that Movant had "left the conspiracy voluntarily." (Doc. 26 (Sentencing Hr'g Tr.) at 23).

Movant has failed to establish that counsel's performance was deficient or that he was prejudiced by that performance. Because Movant's sentence was not based on money laundering activity that took place after he withdrew from the conspiracy in June 2015, his first claim of ineffective assistance of counsel fails.

**B.** **Counsel Failed To Inform Movant About All The Details Of His Charges And That He Could Have Negotiated A Different Plea.**

Movant presents no argument in his memorandum of law to support his next

7

claim, that his plea was in part unknowing, although in his affidavit he states that a couple of weeks after his May 2017 indictment for passport fraud, "my attorney came [to] see me with some evidence of a money laundering conspiracy and some printouts with surveillance photos in Walmart where I was seen standing in front of a customer service desk and also in front of a bank teller counter. I told him everything about my job, how I started working and what was my part in this job." (Movant Aff. ¶ 21). Then, a couple of months after his June 21, 2017 interview with federal investigators, counsel visited him and "gave [him] a plea agreement." Because Movant "did not understand English fluently," he asked for a translation into his native language, Gujarati. (*Id.* ¶ 24).

> Several weeks later, Mr. Alper [Movant's counsel] came to me with it translated and he told me to read it and if I didn't understand it to call him. *He did not tell me that I could ask for a different plea or make any changes.* I told him about my part in the job and asked him, why I had to take a plea? I told him that I just worked for my boss and that I did not know about the $1.5 million to $3.5 million. I never touched that money. I worked for a monthly salary. Mr. Alper said that it was not only me, everybody had to accept that amount because of conspiracy but Mr. Alper told me that I did not have [to] worry about the amount. He explained the word "conspiracy" to me with an example of a "bank robbery" case. He told me not to worry about the amount because the government did not need me because they were looking for the big fish in the telephone fraud scam. I argued again with him about the amount of $1.5 million to $3.5 million. I told Mr. Alper that I will not accept that amount because I did not launder[] that money. I have never seen that much money in my entire life.

8

(*Id.* ¶ 25 (emphasis added)).

> August 17, 2017 was my day to sign my plea agreement. I tried to tell the Honorable Judge the truth but my attorney Mr. Alper stopped me and said 'we had already discussed the plea before I signed so I have to sign or go to trial.' <u>My attorney advised me that if I went to trial and lost, I would get more than ten years.</u> So I became afraid and I took the plea[,] as Mr. Alper said [] I would get between 18 months to 21 months which was Base Offense Level 16.

(*Id.* ¶ 26).

The government responds that Movant's claim that his plea was somehow coerced or unknowing is belied by his plea colloquy, during which he acknowledged that he had read the criminal information against him—having waived indictment and formal arraignment—and that he understood the charges in both the -277 information and the -158 indictment. (Gov't Resp. at 13-14 (citing Plea Hr'g Tr. at 7-9)). Later, "after a prosecutor summarized the relevant plea terms, [Movant] acknowledged that he understood and agreed with the terms of the written plea agreement; that no one had forced or coerced him in any way to enter the plea agreement; and that he entered the plea freely and voluntarily." (*Id.* at 14 (citing Plea Hr'g Tr. at 19)). Asked by the prosecutor if a paragraph in the Plea Agreement "above your signature indicates that you have reviewed the indictment and the criminal information and you discussed it with your attorney and you understand those charges[,]" Movant replied that it did. (*Id.* (citing Plea Hr'g Tr. at 20)). The

9

government summarizes its argument as follows:

> These excerpts from [Movant's] plea hearing plainly show that he understood the nature of the charges against him, had discussed the charges with his defense counsel, and had sufficient time to consult with his counsel about the charges and his guilty plea. Notably, [he] never requested further time to review additional discovery, obtain more information, or confer further with defense counsel.

(*Id.* at 15). Movant acknowledged at the plea hearing that he understood the maximum penalties for his crimes: 10 years for passport fraud and 5 years for the money laundering conspiracy. (Plea Hr'g Tr. at 23-24).

In his reply brief, Movant asserts that counsel "never explained the court proceedings [or] the paragraph entitled 'LIMITED WAIVER OF APPEAL,' what a collateral attack meant, what a plea agreement meant and what effect that plea agreement would have on [his] sentence." (Doc. 30 at 2). But Movant acknowledged at his plea hearing, through an interpreter,[2] that he understood these things,

---

[2] Movant's counsel explained that "given the legalese of the documents and the nature of the proceedings," he and Movant "both felt more comfortable" with an interpreter present, although Movant "does understand English pretty well. I've conversed with him numerous times in English, and he hasn't had problems understanding me." (Plea Hr'g Tr. at 4). And although Movant complains in his reply brief about the quality of the translation of the Guilty Plea and Plea Agreement into his native language (Doc. 30 at 2-3), he had ample opportunity at the plea hearing to express his dissatisfaction with it, but he failed to do so. (*See* Plea Hr'g Tr. at 12-13 *et seq.*).

including that the District Judge would not be bound by the government's sentencing recommendation as outlined in the plea agreement or by the maximum sentence as determined under the advisory sentencing guidelines. (*See generally* Plea Hr'g Tr.; *id.* at 24-25, 28).

Movant has not offered evidence of coercion, or that he did not understand his guilty plea proceedings, to overcome the solemn declarations he and his counsel made during those proceedings. *See Connolly*, 568 Fed. Appx. at 771 ("The Supreme Court has determined that a defendant's representations at a plea hearing 'constitute a formidable barrier in any subsequent collateral proceedings.' This is because '[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.' " (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977))); *see Blackledge*, 431 U.S. at 73-74 ("[T]he representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.").

Movant's specific claim that he would not have pleaded guilty had he known about the four-level Business of Laundering Funds ("BLF") enhancement (Doc. 30

11

at 3-4) is unavailing in light of the extensive evidence from his guilty plea proceedings, described above, showing that he understood the consequences of his plea, including that there was no certainty about what his ultimate sentence would be. And, indeed, although Movant asserts in his reply brief that counsel told him how to answer the Court's questions and "that he [would] not be allowed to make any objections in court" (*id.* at 4), Movant did *sua sponte* object during the government's recitation of the evidence against him and, after consulting with counsel, made his position on that matter known to the Court. (Plea Hr'g Tr. at 33-35). To the extent that Movant argues that an evidentiary hearing is required to determine whether counsel promised him a term of imprisonment of 18 months, that argument fails because Movant acknowledged at his plea hearing that counsel had *not* promised him a particular sentence and that the determination of his sentence was a matter for the Court, not the government or counsel. (*See id.* at 21, 24-25, 28).

The government also argues that "a defendant has no constitutional right to plea bargain, and thus, counsel may not be considered ineffective for failing to obtain a plea bargain—or a 'better' plea bargain—from the government." (Gov't Resp. at 15). The Court agrees. *See Toepfer v. United States*, 518 Fed. Appx. 834, 841 n.2 (11th Cir. 2013) (noting that the Supreme Court of the United States "has [] suggested that [] there is no freestanding constitutional right to a plea bargain" (citing

12

*Missouri v. Frye*, 566 U.S. 134 (2012), and *Lafler v. Cooper*, 566 U.S. 156 (2012)));

*Leitman v. United States*, 13-CIV-24029, 2016 U.S. Dist. LEXIS 124217, at*42

(S.D. Fla. Sept. 12) (rejecting § 2255 movant's contention that "counsel failed to

negotiate a better plea bargain"; and citing *Missouri v. Frye*, 566 U.S. 134, 148

(2012), for the proposition that "to complete [a] showing of prejudice [arising from

counsel's allegedly deficient performance], defendant must not only show that he

would have accepted a[] better offer which counsel failed to communicate, he must

show that the prosecution would not have withdrawn the offer and the court would

have accepted it"), *adopted by* 2016 U.S. Dist. LEXIS 137861 (S.D. Fla. Sept. 29,

2016); *see also Frye*, 566 U.S. at 148-49 ("a defendant has no right to be offered a

plea nor a federal right that the judge accept it" (citing *Weatherford v. Bursey*, 429

U.S. 545, 561 (1977), and *Santobello v. New York*, 404 U.S. 257, 262 (1971))). In

sum, this second ineffective assistance ground also fails.

### C.   Counsel Failed To Provide Movant With The Discovery In His Case.

The government notes that Movant has provided no details about his alleged

lack of access to discovery materials and that he acknowledges in his affidavit that

his counsel showed him photographs taken of him while he was laundering funds.

(Gov't Resp. at 16). The government also notes that there was no formal discovery

process in the money laundering case because Movant offered his guilty plea without indictment, and that "even in a post-indictment scenario," a defendant's claim that counsel provided ineffective assistance by failing to share discovery materials with him normally has little chance of success. (*Id.* at 17). Finally, the government notes that during the plea hearing, "[i]nstead of telling the Court that he needed more time to review discovery, or that his attorney had not provided him with requested material, [Movant] affirmed that he had had enough time to discuss the case with his attorney and was satisfied with his attorney's representation." (*Id.*).

Once again, Movant has offered no evidence that he was prejudiced by counsel's alleged failure to share discovery materials with him. *See, e.g., Hinton v. United States*, 15 C 0752, 2015 U.S. Dist. LEXIS 55747, at \*7-8 (N.D. Ill. Apr. 29, 2015) ("Petitioner has failed to identify any case law or source supporting his argument that he has a right, let alone a constitutional right, to view discovery materials. Indeed, many federal courts have concluded that there is no such right. Instead, counsel's obligation under the circumstances [i.e., where there actually has been discovery] is to review and discuss the discovery materials with his client to keep him 'informed of important developments in the course of the prosecution.' " (citations omitted)). This ground fails.

D.    **Counsel Failed To Object Sufficiently About Movant's Mitigating**

14

**Role In The Conspiracy Under U.S.S.G. § 3B1.2 And To Present At Sentencing Information That Movant Had Provided To Demonstrate His Good Character History And His Mother's Health Issues In India.**

Movant argues that he should have received a guideline reduction for his minor role in the money laundering offense. But unless this claim derives from his counsel's ineffectiveness, Movant waived the claim by knowingly agreeing to an appeal waiver. Movant does not provide any basis for concluding that his counsel performed deficiently in this regard—indeed, *he does not even mention counsel's performance* in his argument on this and his related claims challenging the Court's sentencing calculations. (*See* Doc. 20-1 at 13-20).

Counsel raised the issue of Movant's role in the offense both in the sentencing memorandum (-158, Doc. 24 at 2-3) and at the sentencing hearing (Doc. 26 at 10-12). Counsel also presented the evidence regarding Movant's character and his mother's illness to which Movant refers. (*See* -158, Doc. 24 at 3-4 ("Defendant's mother is very ill and Defendant is anxious to return home to India to take care of her. See Letter from Dr. Rathod, attached hereto as 'Exhibit B.' Defendant is a college graduate with a degree in chemistry. Since graduating from college, Defendant worked steadily in India as a chemist and [] a computer systems supervisor. A copy of Defendant's degree and employment reference letters are

15

attached hereto as 'Exhibit C.' The [] character letters, attached hereto as 'Exhibit D,' attest to Defendant's moral character and impeccable reputation in his community."); *see id.,* Exs. A-D).

Movant has failed to suggest how counsel might have argued more effectively for a minor role reduction, and thus he has failed to establish ineffective assistance of counsel with respect to this claim.

### E. **Counsel Failed To Argue That The Loss Amount Was Not $1.5 To $3.5 Million Under U.S.S.G. § 2B1.1(b)(1)(I) But Was Actually $37,000.**

Movant presents the following argument regarding the loss amount:

> Movant was enhanced sixteen (16) levels for the entire amount allegedly laundered in the conspiracy which was allegedly between $1,500,000 and $3,500,000. However, on the one hand, according to Movant's PSR [(Pre-Sentence Report)], the "actual loss amount" recommended was calculated to be only $47,000. Then, in Movant's guilty plea, the "actual loss amount" was determined to be "more than $37,000." However, according to the actual Victim Impact Statements, "Victim T.T." lost $14,982.15 and "Victim L.K." lost $22,000, for a grand total of $36,982.15. Therefore, according to 2B1.1(b)(1)(D), Movant's base offense level should have only been increased by 4 levels as the loss was "greater than $15,000, but no more than $40,000." Movant's sentence should not have been enhanced by the sixteen (16) levels which he eventually received. Accordingly, the district court clearly erred when it did not make specific factual findings upon which to base the loss amount attributable to Movant.

(Doc. 20-1 at 25).

The government responds that as part of his written plea agreement, Movant

agreed that the loss amount was between 1.5 and 3.5 million dollars. (Gov't Resp. at 20-21 (citing Plea Agreement ¶ 12)). And "[i]n the PSR, the Senior Probation Officer found that the proper loss amount attributable to [Movant] was between $1.5 and $3.5 million and, accordingly, added 16 levels to [Movant's] offense level." (*Id.* at 21). The government notes that Movant was not charged for the losses attributable to the entire conspiracy, which reached into the hundreds of millions of dollars, but only "for funds that he and the crew of runners with which he worked laundered over an eight to nine-month period." (*Id.*). The government also argues that the loss amount in a case such as this is not calculated based solely on the Victim Impact Statements attached to the government's sentencing memorandum. (*Id.*). The government explains:

> Under U.S.S.G. §2S1.1, the base offense level for a conspiracy to commit money laundering charge is eight plus the corresponding number of levels from the table in §2B1.1 for "the value of laundered funds." The application notes to this section define "laundered funds" as the funds "involved in the transaction, or transmission, or transporting or transferring . . . funds . . . in violation of 18 U.S.C. § 1956 or § 1957." Thus, the question before the Court was whether the value of the funds laundered by [Movant was] between $1.5 and $3.5 million, as set forth in his plea agreement. The calculation of the value of laundered funds includes the aggregate of all funds involved in a money laundering scheme, without regard to either the actual loss to the victims or return of any money to the victims. The government's calculations of [Movant's] loss amount indicated that he and his immediate conspirators laundered between $1.5 and $3.5 million of fraud proceeds between October 2014 and May 2015. The government

17

shared this information with defense counsel, and the parties agreed to include this loss amount in [Movant's] plea agreement.

(*Id.* at 22 (citation to *United States v. Thompson*, 40 F.3d 48, 52 (3d Cir. 1994), omitted); *see id.* at 22-23 (citing cases to the effect that "[d]efense counsel was not deficient for failing to argue a different loss amount than that which the parties agreed to in the plea agreement.")). Finally, the government notes that Movant "has offered no evidence to support a lower loss amount that would still be consistent with the Guidelines' instructions for calculating the loss amount" and "has failed to demonstrate that the Court would have adopted a lower loss amount had defense counsel argued one." (*Id.* at 23).

This claim fails. Participation in a conspiracy exposes a defendant to punishment for the entire amount of the loss resulting from the conspiracy, even for those portions of the loss not directly attributable to the defendant's actions. *See United States v. Rabuffo*, 716 Fed. Appx. 888, 902 (11th Cir. 2017) (citing *United States v. Rodriguez*, 751 F.3d 1244, 1256 (11th Cir. 2014) ("holding that defendant in mortgage fraud scheme 'participated in the conspiracy and did not withdraw from it, thus she [was] responsible for the losses resulting from the reasonable foreseeable acts of co-conspirators in furtherance of the conspiracy' "); *United States v. Moran*, 778 F.3d 942, 975 (11th Cir. 2015) ("finding that fraud defendant was responsible

18

for entire amount Medicare was billed during scheme and rejecting 'argument that his loss amount should be limited to the billings for only his individual patients and his personal actions' ")); *see also Chrisman v. United States*, 1:16-CR-20-SCJ-AJB, 2018 U.S. Dist. LEXIS 134512, at *8-9 (N.D. Ga. May 15) (rejecting § 2255 movant's claim of ineffective assistance for failing to challenge loss amount, in part because "Movant in his plea agreement agreed to the loss amount" and, in his § 2255 motion, he failed "to show even a remote possibility of prejudice"), *adopted by* 2018 U.S. Dist. LEXIS 133345 (N.D. Ga. Aug. 8, 2018).

The same reasoning applies here. Movant has not shown that there was a reasonable probability that the outcome of his sentencing would have been different had counsel challenged the loss amount, i.e., the very same amount to which Movant agreed in his plea agreement. (*See* Doc. 3-1 ¶ 12).

### F.   Counsel Failed To Object Sufficiently To The Enhancement For Being In The Business Of Laundering Funds Under U.S.S.G. § 2S1.l(b)(2)(C).

Movant argues that his four-level sentencing enhancement for being in the BLF was improper because "the person committing the offense must have knowledge of the illegitimate source of the funds[, which Movant lacked] because he was hired as an employee to obtain money orders and bank deposits for the business which was falsely represented to him as a business dealing in finance and

19

loan payments." (Doc. 20-1 at 19). He also "was paid $100 per day by his employer for his work and did not receive any profit directly from the laundered funds"; had no prior experience in laundering funds; had no criminal history; and once he learned that the funds were illegitimate, "he promptly quit the job." (*Id.* at 19-20). Finally, he argues that the phrase "in the business of laundering funds" is "ambiguous in its language" and "unconstitutionally vague." (*Id.* at 20). Movant argues that the Court erred in enhancing his sentence on this basis, but nowhere does he explain how, or even argue that, his counsel was ineffective with respect to the enhancement. (*See id.* at 19-20).

The government responds by pointing out that counsel argued this issue in "written objections to the PSR[] for applying a four-level enhancement for [BLF], and for failing to apply a downward adjustment for [Movant's] role as [a] minor participant. Then, defense counsel raised these arguments again in the sentencing memorandum that he filed with the court on [Movant's] behalf," and again in Defendant's Reply to the Government's Sentencing Memorandum, in which "defense counsel made arguments related to the language of the guidelines, the application notes, and relevant case law; attempted to distinguish the caselaw upon which the government relied; and discussed the details of [Movant's] involvement

in the scheme." [3] (Doc. 29 at 18 (citing -158, Doc. 26)). "Finally, at the sentencing hearing, defense counsel again argued that the [BLF] enhancement should not apply and that [Movant] should receive a mitigating role reduction." (*Id.* at 19 (citing Sentencing Hr'g Tr. at 7-12)). The government concludes by arguing that the Limited Waiver in Movant's plea agreement bars him "from appealing his sentence on the grounds that the sentencing court overruled his objections to the guidelines calculations. And as for [his] claim of deficient representation, the written record of his sentencing hearing shows that defense counsel's advocacy regarding these objections did not fall below an objective standard of reasonableness." (*Id.*; *see* Sentencing Hr'g Tr. at 7-12, 22-25).

The Court agrees. Counsel presented several cogent arguments on Movant's behalf. That they failed is indicative of how serious the government and the Court deemed the money laundering conspiracy and Movant's participation in it. The

---

[3] In Defendant's Sentencing Memorandum, counsel incorporated by reference the arguments in his objections to the PSR concerning the BLF enhancement. (-158, Doc. 24 at 2). Counsel argued—in light of the totality of the circumstances and the list of factors in Application Note 4 to U.S.S.G. § 2S1.1—that "this enhancement should not apply to [Movant] as he was not a professional money launderer[; he] only engaged in this activity for a period of nine months[; and he] did not make substantial financial gains through his activities and was at all times directed by other members of the conspiracy." (*Id.*).

failure of these arguments is not a reflection on counsel's performance. *See United States v. Lazo*, 491 Fed. Appx. 942, 944-45 (11th Cir. 2012) (concluding that district court did not clearly err in finding that appellant was in the business of laundering funds, based on the six factors listed in the commentary to U.S.S.G. § 2S1.1, comment. (n.4(A)—including (1) regularly engaging in the laundering of funds (2) over an extended period of time (3) from multiple sources (4) for substantial revenue compared to the amount of income appellant otherwise could have earned—at least three of which factors, it is reasonable to conclude, also applied to Movant).[4]

### G.  Counsel Failed To Argue That Movant Is Entitled To An Additional 3-Level Reduction Under U.S.S.G. § 2X1.1.

Movant argues that he "and his sub-group of four co-defendants <u>did not complete all of the acts</u> required to launder the funds such as the primary act of loading funds onto the reloadable prepaid debit cards and the ending act of acquiring the bank accounts. As such, Movant respectfully submits that he is entitled to an

---

[4] In his reply brief, Movant insists that he would not have pled guilty had he known his sentence could be enhanced on any basis other than those specified in his plea agreement. He also argues, again, that he was not in the business of laundering funds. (Doc. 30 at 5-6, 8). But Movant's Plea Agreement provides: "[T]he parties also reserve the right to make recommendations regarding application of the Sentencing Guidelines. The parties understand, acknowledge, and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed." (Doc. 3-1 ¶ 14; *see id.* ¶¶ 12-13).

additional three-level reduction pursuant to § 2X1.1." (Doc. 20-1 at 23); *see* U.S.S.G. § 2X1.1(b)(2) ("If a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense . . . .").

> The government responds:
>
> By the plain language of § 2X1.1(b)(2), [Movant] would not be entitled to a three-level decrease, because [Movant] and his many conspirators indeed *did* complete all of the acts necessary to successfully complete the substantive offense of money laundering; as well as several other offenses including wire fraud, impersonation of federal officers, access device fraud, and identification document fraud. [Movant] and his conspirators successfully completed these crimes *hundreds* of times against hundreds if not thousands of victims, during the eight to nine months that [Movant] was involved in the conspiracy. [And], pursuant to the terms of his plea agreement, [Movant] waived the right to object to the Court's calculation of his total offense level and applicable guideline range. Therefore, defense counsel cannot be considered ineffective for choosing not to argue for a reduction of [Movant's] offense level under this guideline section that clearly did not apply to the facts of [Movant's] case.

(Doc. 29 at 24 (formatting altered)). The Court agrees, and it is patently obvious, that there is no basis in the record for a three-level reduction under § 2X1.1(b)(2) based on Movant's failure to complete the money laundering leg of the conspiracy.

### H. <u>Counsel Failed To Insist That The Government File A Substantial Assistance Motion Under U.S.S.G. § 5K1.1 Or Fed. R. Crim. P. 35(b).</u>

Movant argues that because "he was immediately cooperative with the

government" after his arrest and provided information that led to the arrest of a co-conspirator, he was entitled to a substantial assistance motion from the government. (Doc. 20-1 at 11). Movant claims that his attorney "was fully aware of [his] extensive cooperation, yet failed to insist that the government abide by its promises to file a 5Kl.1 or Rule 35(b) motion on [his] behalf. Had [counsel] done so, there was a reasonable probability that Movant would have received a lesser sentence." (*Id.*).

The government responds that Movant's plea agreement explicitly left it solely to the government's discretion whether Movant's assistance warranted a motion for a downward departure under U.S.S.G § 5K1.1 or Fed. R. Crim. P. 35. (Doc. 29 at 25 (citing Plea Agreement ¶ 18)). "The government cited [Movant's] cooperation as a reason that the government agreed to a one-point downward variance and to cap its sentencing recommendation at the low end of [Movant's] applicable guidelines range. Likewise, defense counsel also raised the fact of [Movant's] cooperation with the sentencing court at the sentencing hearing." (*Id.* (citing Sentencing Hr'g Tr. at 18, 23-24)).

This claim fails because it was in the government's sole discretion whether to file a substantial assistance motion on Movant's behalf. And, as counsel noted at the sentencing hearing, the government already had in its possession the information that Movant provided about his co-conspirators. (*See* Sentencing Hr'g Tr. at 24). The

24

government was entitled to conclude that Movant's assistance was not substantial and therefore to decline to file a sentence reduction motion on his behalf.

**I.      Counsel Failed To Argue That Movant Had No Prior Criminal History Points.**

Movant does not make a specific argument on this claim. The government responds:

> [Movant] erroneously claimed that defense counsel failed to argue that [he] had no prior Criminal History points. Defense counsel informed the Court in his sentencing memorandum that [Movant] "is a thirty-nine year old man with no prior criminal history." (-158, Doc. 24 at 3.) [And Movant] cannot show that this claim of alleged error would have altered the outcome of his case because the Court determined at sentencing that [he] was in Criminal History Category I and calculated [his] advisory guidelines range accordingly. (Sentencing Hr'g Tr. at 5, 16.)

(Doc. 29 at 26 (citations altered)). The Court agrees. This claim fails, as Movant ultimately acknowledges. (Doc. 30 at 11).

**J.      Counsel Failed To Argue Sufficiently That Movant Received A Disproportionate Sentence As Compared To His Co-Defendant, Ramanbhai Patel, Who Performed The Exact Same Functions As Movant, But Received A Sentence Of Only Two Years' Probation.**

Movant argues that counsel "was not sufficiently aggressive in arguing" that he should have received the same sentence—two years' probation—that a co-defendant, Ramanbhai Patel ("Raman"), received for similar activity in another sub-group of the conspiracy, based in Arizona. (Doc. 20-1 at 26). " 'Compar[ing] apples

25

to apples,' Movant [argues, he] should have received a similar sentence [to Raman's], and a far lesser sentence than 51 [] months." (*Id.*).

The government responds that "[i]n his sentencing memorandum, defense counsel spent several pages comparing [Movant's] case to that of his [co-]conspirator Raman." (Doc. 29 at 26 (citing -158, Doc. 24 at 5-8)). And "[a]t the sentencing hearing, defense counsel again noted that Raman [] had received a probationary sentence of two years and received a two-level role reduction. (Sentencing Tr. at 12, 24-25.) Defense counsel brought up this comparison case twice during the sentencing hearing in an effort to encourage the Court to sentence [Movant] similarly and impose a time-served sentence." (*Id.* at 27).

In its own sentencing memorandum, the government argued that the two situations were inapposite, "not only due to Raman[]'s advanced age and many health conditions, but because [his] criminal involvement was very minimal compared to that of [Movant]." (*Id.* (quoting -158, Doc. 25 at 22 n.7.); *see id.* (noting that Raman's "activity was confined to south-central Arizona where he resided ([unlike Movant,] he never traveled across . . . state lines to work for the conspiracy); he only worked occasionally; and he was not paid for his work, apart from receiving occasional sums from his son to cover gas and food costs. Instead, [Movant's] conduct is more fairly compared to that of the other 22 defendants in the Texas case,

not a single one of whom received a probationary plea, and several of whom pleaded guilty to 20-year money laundering and wire fraud conspiracy charges")).

Once again, given the seriousness of his crime, Movant has failed to show that there was a reasonable probability that a more forceful argument would have convinced the Court to give him a probationary sentence. This claim also fails.

**K.** **Counsel Failed To Argue That Movant Was Not Involved In And Had No Knowledge Of The Scam Of Calling People And Threatening Them To Pay IRS Money.**

**L.** **Counsel Failed To Prevent The Government From Introducing The Evidence Of The Telephone Calling Script With The Money Laundering Charge Which Was Highly Prejudicial And Resulted In An Enhanced Sentence.**

Movant argues, with respect to these two claims, that he "had absolutely no knowledge whatsoever of or participation in the telephone scam. Nevertheless, [his] attorney allowed the government to introduce evidence of the telephone scam calling script at sentencing which was highly prejudicial and resulted in an enhanced sentence." (Doc. 20-1 at 12).

The government notes that at the sentencing hearing, counsel made the following argument:

> [Movant] is not the person at the call center or the person managing the call centers or managing the money launderers who are getting the money from the people who are being victimized. He is a runner. He is a domestic runner. So he's not the guy who is reading that script that's

27

> attached to the government's sentencing memo saying, you know, whip them on their knees, go in for the kill and threatening them or doing that. He's not participating in that at all. And I think that's a very important distinction. He did not know initially that this was a fraud scheme when he got involved. His buddy got him into it. He left the conspiracy voluntarily. There's no question he participated in it when he knew it was a scam fund for a few months. We're not disputing that. But his role in this overall scheme was very limited, as I argued previously.

(Doc. 29 at 28-29 (quoting Sentencing Hr'g Tr. at 23)). And the government points out that its case against Movant derived from "his actions as a full-time, domestic money launderer for the scheme, upon whom the call center workers and operators were dependent," not from his involvement with the call centers directly. (*Id.* at 29). But "[w]ithout runners like [Movant], there was no mechanism for the India-based conspirators to liquidate and launder fraud proceeds." (*Id.*). The government notes further:

> [T]he Court made no mention of the IRS script in handing down its sentence, which was at the very low end of [Movant's] advisory guidelines range and included a one-level downward variance. [Movant] fails to demonstrate that the IRS script impacted the sentence that he received, *i.e.* that the Court would have sentenced him *below* his advisory guidelines range if defense counsel had somehow succeeded in striking the script from the record.

(*Id.* at 31).

Again, the Court agrees with the government here. Movant simply has failed to show that counsel's performance was deficient or that he was prejudiced thereby.

28

These claims fail.

**M.   Counsel Failed To Argue That It Was Highly Prejudicial For The Government To Introduce Victim Impact Statements At Sentencing Where It Was Clear That Movant Did Not Participate And Had No Actual Knowledge Of The Telephone Scam.**

Finally, Movant argues:

The introduction of [two] victim impact statements [("VISs")] by the government was designed to inflame the court and trigger a harsh sentence. . . . Movant's attorney did nothing to prevent these statements from being introduced and even when they were, did nothing to mitigate their effect upon the court. As such, it a gross display of the ineffective assistance of counsel.

(Doc. 20-1 at 12-13).

The government responds that because of its legal obligations under the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, and Fed. R. Crim. P. 32:

defense counsel had no grounds upon which to object [] to [its] proffering of VISs from [Movant's] victims. Indeed, the law required that the Court, Probation, and the government actively seek out information about the impact of [Movant's] crimes on his victims. Furthermore, defense counsel did take pains at the sentencing hearing to distinguish the conduct of the callers who extorted victims by phone from that of [Movant].

(Doc. 29 at 31-32). "Thus, [Movant] is also unable to demonstrate that some further actions on defense counsel's part would have affected the outcome of [his] case."

(*Id.* at 33). The government's response speaks for itself. This final claim also fails.

**N.   Summary**

29

As the government has forcefully argued, with ample support from the record, Movant has failed to demonstrate that either part of the two-part test for ineffective assistance of counsel applies to any of his claims. Indeed, the government argued persuasively at sentencing that a lesser sentence for Movant—such as the time-served sentence that counsel advocated—would send the wrong message to the perpetrators and the victims alike of the fraud and money laundering scheme that scammed hundreds of millions of dollars from tens of thousands of United States residents. Movant may have received only $100 per day, but he played an essential role in the overall scheme, and he traveled extensively to implement his role. (*See* Sentencing Hr'g Tr. at 12-15, 18-22). His sentence is reasonable and appropriate, and all of his § 2255 claims fail.

## IV.   Certificate Of Appealability

A § 2255 movant must obtain a certificate of appealability ("COA") before appealing the denial of a motion to vacate. 28 U.S.C. § 2255(d); 28 U.S.C. § 2253(c)(1)(B). A COA may issue only when the movant makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the [motion to vacate] should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

30

further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotations omitted). A movant need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir.) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)). Although Slack involved an appeal from the denial of a 28 U.S.C. § 2254 petition, the same standard applies here. *See Jones v. United States*, 224 F.3d 1251, 1254 (11th Cir. 2000) (applying Slack standard in § 2255 case). Because there is no reasonable argument that any of Movant's grounds has merit, a COA should not issue in this matter.

## V.   <u>Conclusion</u>

**IT IS RECOMMENDED** that Movant's 28 U.S.C. § 2255 motion (Doc. 20) be **DENIED** and that Movant be **DENIED** a certificate of appealability.

The Clerk is **DIRECTED** to withdraw the reference to the Magistrate Judge.

**SO RECOMMENDED** this <u>4th</u> day of <u>January</u>, 2019.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge

31